## IN THE MATTER OF LUCILE STOCKMAN ON HABEAS CORPUS.

*Infants—Testamentary guardians—Residence—Parent and child—Conflict of laws—Comity of states.*

1. Courts have a general superintending power over all infants, and the primary guardianship of the parent over his child lasts no longer than he is found to be competent, and discharges his duty, which nature has laid upon him, properly; and when he fails to do this, the proper court may interfere, and charge another with such performance.

2. Primarily, the court is the guardian of all orphan children, and will give the proper directions as to their care and support until such time as a guardian shall be appointed; and it is then its duty to see to it that the duties of the trust are properly discharged.

3. Guardians for infants may be appointed by the last will of the parent instead of by the court, in which case the court will recognize their authority and their control of the ward so long as it is right and proper, and for the best interest of the ward.

4. The powers of a testamentary guardian are the same as are those of a guardian appointed by the court, and are allowed to be exercised or withheld for the same reasons.

5. Who shall or shall not be appointed guardian is within the discretion of the court. Relatives of the infant are usually selected, and those nearest of kin are usually preferred when otherwise competent, and as between those entitled the controlling question to be determined in making the selection is, and always should be, what will be for the best interest of the ward under all the circumstances?

6. In this case it is held that under the agreement made by the father of the infant with his wife's mother, on the request of his wife, and pursuant to which the child was brought from Washington to Port Huron, the last-named city became the child's residence, which was not changed by the agreement afterwards signed in Washington under duress; and that by virtue of their letters of guardianship the respondents have also the lawful custody of the child, the right to which the testamentary guardians never had, except that which comity gave them, and which can never be properly enforced in this State, under the circumstances appearing in this case.

*Habeas corpus* case. Heard May 17, 1888. Writ denied July 11, 1888. The facts are stated in the opinion.

*F. A. Baker* (*E. A. Newman*, of counsel), for petitioners, contended:

1. At common law the power to appoint a testamentary guardian did not exist, but was created by Statute 12 *Charles II.*, which act, at the time of the execution of the will of Hugh R. Stockman, and the probate thereof, was and still is in force in the District of Columbia; citing *Mauro v Ritchie*, 3 Cr. C. C. 147; Rev. Stat. D. C. §§ 937, 938; and at time of such probate the Michigan statute authorized such appointment; citing Comp.

Laws of 1857, chap. 110, § 10; and the appointment of respondents as guardians by the probate court of St. Clair county is a nullity; citing *Fridge v. State*, 3 Gill & J. 103; *Corrie's Case*, 2 Bland, 488; *Balch v. Smith*, 12 N. H. 43; *Coop v. Copp*, 20 Id. 284; *Robinson v. Zollinger*, 9 Watts, 169; *Van Houten's Case*, 2 Green, Ch. 220 (29 Am. Dec. 707).

2. See, also, as to testamentary guardians and their powers. as applicable to the case at bar, Alexander's British Statutes, 467 (note); 3 Waite, Act. & Def. 533, 534, 541, 542; Reeves, Dom. Rel. 453, 454; 2 Kent, Com. 221, and notes; *Kevan v. Waller*, 11 Leigh, 414; *Wilkinson v. Deming*, 80 Ill. 342; *Rex v. Isley*, 5 Adol. & El. 441; *Eyre v. Countess of Shaftsbury*, 2 P. Wms. 103; *Talbot v. Earl of Shrewsbury*, 4 Myl. & C. 672; *Gilliat v. Gilliat*, 3 Phillm. 222

3. The domicile of the minor must follow that of the father; citing *Powers v. Mortee*, 4 Am. Law Reg. 427; *Directors v. James*, 2 Watts & Serg. 568; *In re Afflick*, 3 McAr. 95; *Crawford v. Wilson*, 4 Barb. 504; *Ex parte Dawson*, 3 Bradf. Sur. 130.

4. In support of the proposition that Act No. 133, Laws of 1887, cannot affect the rights of the testamentary guardians, counsel cite Cooley, Const. Lim. 111; *Alter's Appeal*, 67 Penn. St. 341; *Greenough v. Greenough*, 11 Id. 489; *McCarty v. Hoffman*, 23 Id. 507; *Battle v. Speight*, 9 Ired. 288; Wade, Retrs. Laws, §§ 159, 160; Ledg. Const. Stat. 144-146, 151, 152.

*O'Brien J. Atkinson* (*Frank Whipple*, of counsel), for respondents, contended for the doctrines stated in the opinion.

SHERWOOD, C. J. Lucile Stockman is now nine years of age, and resides with her maternal grandparents in Port Huron, who are her guardians in this State, having received their appointment as such on October 19, 1885. The *paternal* grandparents reside in Washington, D. C., and were duly appointed testamentary guardians for Lucile in that city on September 4, 1885. The child's father and mother are both dead. The testamentary guardians are the petitioners in this case, and they seek to recover by the writ of *habeas corpus* this infant girl from the Michigan guardians. Mrs. Stockman, the mother of Lucile, died in the city of Washington on November 24, 1879,

and Hugh R. Stockman, the father, died in the same city on August 23, 1885.

These parents were married in April, 1877, at Port Huron, Mrs. Stockman being only about 16 years of age when married. They remained in Port Huron until some time in July, 1877. There were some unpleasant things occurred in the manner the husband brought about the marriage, and it only need be said they were of a character not calculated to greatly increase the estimate which would most likely be accorded to him by a well-ordered and virtuous community. The wife's parents were a well-to-do and respectable family, who had resided in Port Huron more than 20 years, reputable people in good standing. While in Port Huron the newly-married couple boarded at the Huron House, and Mrs. Stockman was allowed to visit her mother but once, and then for the purpose of getting her trunk before they left the city, and the mother never saw Mrs. Stockman again but once until a few hours before she died. They lived during the marriage in Georgia and in Washington.

After the birth of the child, Lucile, which occurred while they were in Georgia, the mother was allowed to come to Port Huron for a few weeks in July and August, 1879, and then returned to Washington, where she died. Her mother was telegraphed to go to Washington about 48 hours before Mrs. Stockman died, and she was permitted to have the company of Mrs. Shaw, her mother, about 24 hours before she passed away. Before she died, Mrs. Stockman asked her husband to allow her mother, Mrs. Shaw, to take Lucile and keep her, and Mr. Stockman promised her that he would do so. And after the funeral he told Mrs. Shaw of the request his wife had made, and the promise he gave her, and then and there urged Mrs. Shaw to take the child, and do as his wife requested; and upon her suggestion that she would be

willing to take her, and bring her up, but was afraid that he might afterwards change his mind, and take the child from her, he affirmed he would not, saying:

"Oh no, mother. You may have no fear. You take the child and bring her up pure and virtuous, like her mother, and that is all I ask."

Mrs. Shaw then promised him she would take her as requested by her daughter and him, and bring up the child as one of her own.

Mr. Stockman seemed very poor at this time. The only home he had ever furnished for his wife and child was in the family of his father and mother, and at their house; and after paying sundry bills for medicine for Mrs. Stockman before she died, and lending him $50 to help pay his wife's funeral expenses, she took the child Lucile, and brought her to her home in Port Huron, where she and her husband have cared for, supported, maintained, and educated her ever since.

When Mrs. Shaw took the child she was about 17 months old, and, the evidence shows, poor and sickly. She is now healthy, and enjoying her home and the family of her grandparents, where there are several children associates. She is also receiving such Christian education and other advantages as a large and prosperous Michigan city affords; and the testimony is to the effect that she desires to remain with her grandparents in Michigan, where she is contented and happy, and does not want to go and live with her paternal grandparents in Washington, and the maternal grandparents are anxious to have her remain with them, and are willing to maintain, educate, and support her from their own means, and at their own expense.

In the month of August, 1882, and after the child had been at Port Huron about 3 years, Mr. Stockman visited his daughter at Mr. and Mrs. Shaw's, and, after

being there a few days, said he wanted to take her to Washington with him to spend the winter, and Mrs. Shaw could have her again in the spring, and was allowed to take her under his promise that the grandmother could have her again in the spring. Mrs. Shaw went for her in the month of April, 1883, when Mr. Stockman made trouble in getting her, and finally would not allow Mrs. Shaw to bring her away unless she would sign a writing, agreeing to return the child to him whenever he should call for her. Lucile was at the time not well, and these conditions, demanded of Mrs. Shaw before she could gain possession of the child, greatly embarrassed her, and, feeling that she could not leave her in Washington, she signed an instrument purporting to be of the effect stated. She then took the little girl, and returned to Port Huron with her. Mrs. Shaw avers that she was compelled to sign said written agreement before she could get away the child, who was then sick, and, fearing she might die if allowed to remain there, she was ready to do almost anything to get her away, and she was thus compelled, at the risk, as she believes, of the life of the child, and against her will, to sign said written instrument.

After their return to Port Huron, Lucile soon recovered her health, and she was permitted to remain undisturbed with Mrs. Shaw until on or about September 18, 1883, when Mr. Stockman came to the house of Mrs. Shaw, in Port Huron, and unceremoniously took the child away with the avowed purpose of taking her to Washington. This he was not allowed to do by Mr. Shaw, who found him with the child in the city, making preparation to leave with her. Shaw took her from Mr. Stockman, and went home with her. Mr. Stockman thereupon applied to the circuit court for the county of St. Clair for a writ of *habeas corpus* to recover his child. Mr. and Mrs. Shaw

appeared, and filed their answer, contesting his right to
Lucile upon the following grounds:

1. That by reason of the request of the dying mother,
and consummated after her death by the agreement of Mr.
Stockman with Mrs. Shaw, that she should have the care
and custody of the child during her infancy, she was
entitled to take her away.

2. That Mr. Stockman was an unfit person to have the
care, companionship, custody, or education of the child;
that he was intemperate in his habits; habitually used
intoxicating liquor; that he had an ungovernable temper,
and could not control his passions, and was a man of
improper and immoral habits.

3. That he was extremely cross and cruel in his conduct
towards Lucile, and without any sufficient cause would
frequently inflict upon her severe blows, and cruel and
improper punishment.

4. That he improperly treated the child when sick; com-
pelled and forced her to take medicine of his own prep-
aration, and contrary to the advice of physicians.

5. That he held improper relations and intercourse with
bad women, and allowed them in his own rooms, in the
presence of Lucile; and that he is financially unable to
support the child; that he had no home of his own, was
out of health, and was out of business.

The circuit judge ordered the case tried before a jury,
and upon the first trial the jury disagreed, and upon the
second trial, which occurred about a month thereafter,
the jury rendered a verdict that Mr. and Mrs. Shaw
should retain the custody of the child. This verdict was
afterwards sought to be set aside in the circuit court, but
the motion was denied by the circuit judge on May 27,
1884.

On June 23, 1884, Mr. Stockman filed his petition in
this Court, and obtained a writ of *habeas corpus* to obtain
his daughter. The application was substantially upon the
same grounds as had been urged in the circuit court, and
was heard upon the same testimony, with some unimpor-
tant additions, in this Court on October 18, 1884. The

Court, being equally divided in opinion as to what should be done in the premises, caused to be entered the following order on January 30, 1885 :

"In this case, the Court being equally divided in opinion as to the judgment that should be entered, the clerk is directed to make an entry to that effect, and the writ is dismissed for that cause, and without any decision upon the rights of the parties, and without prejudice either to any existing right or adjudication, or to any future remedy."

Here the matter was allowed to rest until Mr. Stockman died, in August, 1885. Previous to his death, which occurred at his father's, in the city of Washington, and on February 20, 1885, he made a last will, in which he appointed his father and mother guardians of Lucile. They qualified, and letters of testamentary guardianship were duly issued to them in the orphans' court of the District of Columbia on September 4, 1885. In and by the will the testator directs his guardians to obtain the legal control of Lucile, and, if necessary to that end, they are directed to use all his property; and if they do not succeed, then he gives his property to his father and mother, if living, and, if not, he gives it in equal shares to his brother and sisters, and recites in his will that Mr. and Mrs. Shaw had committed perjury in their endeavors to retain the child.

In pursuance of and in accordance with the requirements of this will, Mr. Andrew H. Stockman and Anna B. Stockman, his wife, the father and mother of the testator, applied for and obtained a writ of *habeas corpus* from this Court to obtain the custody of their testamentary ward, Lucile, on February 8, 1887.

The petition for the writ does not vary materially in its statement of the facts from those contained in the other application, except, in addition thereto, it states that Mr. and Mrs. Shaw refused to deliver up Lucile to the testa-

mentary guardians when requested; and that at the time the testator died a large sum of money was due him for military service, and which now belongs to Lucile; and that he had some personal property besides, all of which the testamentary guardians had secured and then had; and that, under the decision of the pension office, all of the pension moneys to which Lucile is entitled on account of the service of her father are now being paid to the testamentary guardians; that such pension money and personal estate are sufficient to support the ward; and, further, that they are able, and have property enough, to support her, if necessary, aside from the pension money; and that the respondents, Mr. and Mrs. Shaw, have changed the name of Lucile from Stockman to Shaw, for the purpose of preventing identification, and have had her christened by that name.

The respondents file their answer to the petition, which is in substance the same as that made to the other writs issued, with the further statements that the said Anna B. Stockman allowed the deceased in his life-time to live and cohabit at her house with a harlot. They deny that they have changed, or attempted to change, the name of the child, and aver that they are Lucile's duly-appointed guardians in this State. The answer then proceeds as follows:

"These respondents further state, the said Francis H. Shaw upon information and belief, and the said Marietta H. Shaw from her knowledge acquired as aforesaid, that the petitioners are unfit persons to have the care and custody of the little girl Lucile Stockman, and that by reason of the great change that would take place in her mode of living, and by reason of the great cruelty which would be practiced towards the said infant by the said Anna B. Stockman, they fear that her life would be in danger, and that she would live but a short time; and upon information and belief they state that the said petitioners are persons without any moral restraint whatever; and that in matters of religion they are without any attachment to any Christian or moral community whatever; and that their

surroundings and education would taint and destroy the good moral character of said infant Lucile; and they ask the protection of this Court for such child; and that the facts and circumstances of the petition, and this answer, may be inquired into; and that by the judgment of this Court the prayer of the petitioners may be denied.

"These respondents further state, upon information and belief, that the only object and purpose which the petitioners have in obtaining the custody of said child is to enable them to have some pretext for expending whatever money the said infant may be entitled to under the provisions of the act of Congress of the United States and under the provisions of the will, as set forth in said petition; and they state, upon information and belief, that there is no adequate security filed in any court in Washington to protect the estate of said infant from loss or speculation in case her custody and control should be transferred to the petitioners; and they refer to the affidavit hereto attached as a part of this answer."

The respondents also submit all the testimony upon the former trial, when the matter was before the jury. Such is substantially the issue as made up before us now for consideration.

The superior rights of a father to his child to those of the grandparents, all things else being equal, are no longer before us. It has now come to the single question and consideration whether the paternal or maternal grandparents shall have the care and custody. So far as the desires of the parents are concerned, the father's last wish was that his parents might have such care, and, so far as the mother's feeling in the matter is concerned, it was her dying request that her parents might have the care and training of her infant daughter, and at that time such were his wishes in the matter. I have reviewed all the evidence in this case, and, after applying to it all the knowledge and experience I possess, I must say that at this time, when he was stirred up by all the feelings of his better nature, and they had so far got control of his passions and prejudices as to allow his reason, his judgment,

and affections to dictate what, under all the circumstances, would be best for the future welfare of his little child, in his wishes then expressed and the promise he gave to his dying wife, and the request he made of her mother that she would—

"Take the child and bring her up pure and virtuous, like her mother," saying, "That is all I ask,"—

He gave expression to the true sentiments of his heart, approved by his reason and his judgment; and it was the wisest and best conclusion he could have possibly reached, and in my opinion it ought not now to be disturbed.

The child is a girl. That mother knew better than any one else of its care and many wants and requirements through the period of its infancy and childhood, during a motherless future, and she knew that no one else could have the patience and affection for the little one, and minister to those wants, to the extent of her own mother. Others might be found to take the charge, but none could do it so well. There is no question but that Mrs. Shaw and her husband are competent, able, and well qualified for the duties the guardianship of this granddaughter imposes upon them, and it is a pleasure to them to discharge that duty. The child likes them, and is contented and happy with them. Why should this Court send her to a home where she does not wish to go, to friends she does not know, who have never expressed a desire for her, save to gratify the spleen and prejudice of a father, who by his will left to his daughter as her principal legacy the hatred he bore towards her mother's parents, to a climate not congenial to her health, and which brought her mother to a premature grave?

It is claimed by counsel for the Stockmans that the law is inexorable, and requires this to be done. I cannot agree with counsel upon this subject. Courts have a gen-

eral superintending power over all infants, and the primary guardianship of the parent over his child lasts no longer than he is found to be competent, and discharges his duty, which nature has laid upon him, properly; and when he fails to do this, the proper court may interfere, and charge another with the discharge of this duty. The good of society and the welfare of the State require this, and can never require less. Primarily, the court is the guardian of all orphan children, and will give the proper directions as to their care and support until such time as a guardian shall be appointed; and it is then its duty to see to it that the duties of the trust are properly discharged.

Guardians for infants may be appointed by the last will of the parent instead of by the court, in which case the court will recognize their authority and their control of the ward so long as it is right and proper, and for the best interest of the ward. The powers of a testamentary guardian are just the same precisely as are those of a guardian appointed by the court, and are allowed to be exercised or withheld for the same reasons. Who shall or may be appointed guardian is within the discretion of the court. Relatives of the infant are usually selected, and those nearest of kin are usually preferred when otherwise competent, and as between those entitled the question to be determined in making the selection is, and always should be, what will be for the best interest of the ward under all the circumstances? It should control everything else.

In looking into the circumstances in this case it seems to me but one conclusion can be reached, and that is that this child should be permitted to remain where she now is, with her maternal grandparents. The testimony shows they are doing all that is necessary for her enjoyment, her education, her health, her comfort, and welfare, and without expense to the ward or her estate. Her acquaintances, her associates, her friends, are all

there, and she has all the advantages for moral and intellectual culture, with the accomplishments to be acquired in the best society; and were the change made as desired by petitioners, we are not sure she could have the benefit of all these. And I feel quite certain she would not. She is just at this time of an age when she needs the guardianship of the most exemplary and circumspect. She has now arrived at an age when impressions will become most lasting, and it is of the greatest importance to her future welfare that they should be correct. I do not think this Court would be justified in trying the experiment of transferring her custody to the grandparents at Washington, even though they were equally competent with those at Port Huron; a fact, however, I regret to say, I have been unable to find from the testimony. I am not prepared to give my assent to an experiment fraught with the danger of destroying the happiness of this innocent young girl's future life. There is no law which requires this Court to make such a decision, and justice to the dead as well as to the living protests against it.

Mr. and Mrs. Shaw have been duly appointed guardians of the child in this State. Under the agreement which was made by the father, on request of the mother, with Mrs. Shaw when she brought the child to Port Huron, that place became the child's residence, and it was not changed by the agreement which Mrs. Shaw subsequently signed under duress in Washington. By virtue of the letters of guardianship the respondents have also the lawful custody of their ward, and the testamentary guardians never had any right to such custody, except that which comity gave them, and which can never be properly enforced in this State, under the circumstances appearing in this case. Laws of 1883, p. 3; Laws of 1887, p. 147; How. Stat. § 6312; *In re Rice,* 42 Mich. 528 (4 N. W.

Rep. 284); *Johnstone v. Beattie*, 10 Clark & 'F. 42; *Morrell v. Dickey*, 1 Johns. Ch. 153; *Kraft v. Wickey*, 4 Gill & J. 332; Story, Confl. Law, §§ 494–504; *Overseers v. Overseers*, 5 Cow. 527; *Riley v. Riley*, 3 Day, 74; *Fenwick v. Sear's Adm'rs*, 1 Cranch, 259; Whart. Confl. Laws, §§ 261–264; Reeve, Dom. Rel. 454; *Creuze v. Hunter*, 2 Cox, Ch. 242; *De Manneville v. De Manneville*, 10 Ves. 52; *Wood v. Wood*, 5 Paige, 596, 605; *Leonard v. Putnam*, 51 N. H. 247; *Hubbard's Case*, 22 Alb. Law J. 315; *Ex parte Watkins*, 2 Ves. Sr. 470; *Woodworth v. Spring*, 4 Allen, 321; *Townsend v. Kendall*, 4 Minn. 412; *Boyd v. Glass*, 34 Ga. 253; *In re Turner*, 41 Law J. (Q. B.) 142; *Rowe v. Rowe*, 28 Mich. 353; *Corrie v. Corrie*, 42 Id. 509 (4 N. W. Rep. 213); *People v. Brown*, 35 Hun, 324; 2 Lead. Cas. Eq. (White & T. Notes), 1528; Hoch. Inf. § 56; *Gishwiler v. Dodez*, 4 Ohio St. 615; *McLoskey v. Reid*, 4 Bradf. Surr. 334; *Ex parte Dawson*, 3 Id. 130; *Bennet v. Bennet*, 13 N. J. Eq. 114; Tyler, Inf. 283, 285–292; *Dumain v. Gwynne*, 10 Allen, 270; *In re Spence*, 2 Phil. Ch. 247.

Comity cannot be considered in a case like this, when the future welfare of the child is the vital question in the case. The good of the child is superior to all other considerations. It is the polar star to guide to the conclusion in all cases of infants, whether the question is raised upon a writ of *habeas corpus* or in a court of chancery. The infant's desire in determining where she shall reside, if of sufficient age and uninfluenced, is always listened to with interest, and in this case we have it marked and most emphatic. She wants to remain where she is.

I think the duty of the Court in this case is plain and clear. I have no doubt of Mrs. Shaw's right to the custody of this child under the contract she made with her father at the death-bed of her mother, and I am entirely satisfied that she is now receiving the care she needs, and

that her education is properly attended to, and that she is happy in her home and surroundings, and that she never could be at Washington, under the guardianship of her paternal grandparents.

In my judgment the writ should be denied, with costs, and the child should be allowed to remain where she now is, with Mr. and Mrs. Shaw, in Port Huron.

MORSE and LONG, JJ., concurred with SHERWOOD, C. J.

CAMPBELL, J., (*dissenting*).    If this were a mere difference of opinion on questions of fact legitimately in issue before us, I should probably not care to do more than indicate that I did not agree with the majority of the Court.    But the case is one where the doctrine on which the majority opinion rests is, in my opinion, not in conformity with the fundamental principle that personal rights and liberties cannot rest on the uncontrolled discretion of courts or magistrates, and that legal rights cannot be lawfully disregarded.    The only facts legitimately in issue are not, I think, open to any very serious difference of opinion.    Laying aside irrelevant matters, upon which, however, I do not think respondents stand in any superior position upon the burden or results of the testimony, I cannot think there should be any doubt on relators' rights before us.    And to reach any result favorable to the defense, we must disregard our own previous action, which I will briefly refer to.

The father of this child, who is still of tender years, and legally incapable of being entitled to choose her own guardians or custodians, applied to the circuit court for the county of St. Clair, and was granted a *habeas corpus*. That court allowed respondents to introduce whatever testimony they chose, and they got in a large mass of what was treated as testimony, and the court, instead of

exercising its own duty in deciding upon the question of custody, left the whole to be dealt with by a jury, and the jury finally decided in favor of respondents. This Court issued a *habeas corpus* as, an act of original jurisdiction, and, holding the circuit proceedings as having no effect here on the inquiry, directed the parties to take testimony, and confined the issues within certain limits. These were not allowed to include the scandalous aspersions on the husband and his dead wife concerning their marriage. The record shows just how far the issues were allowed to be made up, and they did not include a very large share of the matters included in the circuit stenographer's minutes, which are not evidence here, and could only be made so to the extent agreed on by the parties. Much of it is irrelevant, and all of it is inadmissible, except as made so in this Court.

Some testimony was taken, and on the final hearing the then Judges of this Court divided in opinion, but in so doing ordered that nothing in the record should prejudice any future application in any way whatever. It is unfortunate that, as was then usual, nothing was filed to indicate on what we differed. But there could not at any rate properly be differences on issues not before us.

The father died, and in his will appointed his father and mother testamentary guardians. The will was proved in the District of Columbia, where both parents had resided, and which was in law the infant's domicile. Those guardians now seek to recover the child, and are opposed by the maternal grandfather and grandmother, who have got out letters from the probate court of St. Clair county, which is the county in which they detained the child against the will of the father, and in fraud of the agreement by which they got possession of her.

When this Court issued the present writ of *habeas corpus,* the only issue which we ordered to be passed upon was

the fitness of the testamentary guardians to have custody
of the infant. I do not understand on what principle
any other issue is before us. Neither do I see that any
other inquiry was legitimate in any legal point of view.

I do not propose to consider the wishes of this child in
the matter. She is too young to have any intelligent
judgment, and is not entitled in law or in common sense
to select her custodians. That she is prejudiced as far as
so young a child can be against her father and his parents,
is the necessary result of the sedulous efforts of her pres-
ent keepers; and it could not be otherwise. To allow
feelings thus cultivated any respect in such a controversy
is to encourage what ought to be reprobated.

If we had any right to appoint guardians for this child,
which is not a power the law has given us, and if the
two sets of grandparents were candidates for that position,
I am not prepared to say that, so far as social and per-
sonal respectability is concerned, the Michigan grand-
parents are not in perfectly good standing, and able to
bring up the child, and kindly disposed to do so. There
is nothing against their personal character.

On the other hand, the testimony is equally clear from
witnesses of as high a character as anybody in Washing-
ton, where they have lived and been known a great many
years, that the grandparents there stand just as well as
respondents, are socially thoroughly reputable, and iden-
tified with religious associations of the best kind, and are
in all respects worthy and esteemed members of society.
The witnesses who know them are themselves well known,
and beyond reproach. The place where they live is not
a new domicile. The idea that their witnesses cannot be
supposed to know what they swear to is not one which we
have any reason or right to assume. Unless these persons
are affirmatively shown to be unfit to have charge of such
a child, they have prevailed on the only issue which we

·ordered to be tried, and should recover possession of her. That they are fit is clearly established, unless we disregard unimpeached testimony, which stands unshaken.   Respondents, in their answer, have set up calumnious charges, which they have neither proved nor attempted to prove. We have no right to let the fair fame of any one be impeached by our decision without satisfactory proof.   The proof is the other way.

I cannot conceive any legal justification, under such circumstances, for refusing to put this child's custody where it belongs, both by the laws of Michigan, if they apply, and by the laws of the United States, which are to the same purport, namely, that the surviving father may appoint testamentary guardians for his children.

There is and there can be no rule which leaves any court unqualified power, at its own will, to abolish the rights and incidents legally springing out of the family relation, and to disregard the positive rules of the statutes.   No rule is better settled than that the domicile of a child must always be where the father's domicile is; and our laws recognize the father's absolute right to appoint a guardian.

When such a power has been exercised, those courts which have gone furthest in assuming a very doubtful discretionary power in violation of the rights at law have limited interferences with legal guardians to cases where they cannot safely be trusted.   The courts thus far have not ventured to hold that their rights can be held subject to the unlimited discretion of judges, or interfered with unless their own conduct has forfeited them.   And Lord Eldon, who is notorious for having stretched this power to extreme limits, and acted on very peculiar notions of what were proper conduct and opinions, himself declared it was no part of the function of courts as such to use it.   In *De Manneville v. De Manneville*, 10

Ves. 52, a case which has not met with much respect for its stretch of power, he expressly decided that the court of king's bench, which is the highest of the ordinary common-law courts, could not interfere to deprive a father of his child's custody by the exercise of—

"Any of that species of delegated authority that exists in the king, as *parens patriæ*, and resides in this court as representing his majesty." Page 59.

He himself did not treat this power as one which could be exercised except on an original chancery proceeding, and such is the view of the best writers on the subject. 2 Story, Eq. Jur. § 1351; 3 Pom. Eq. Jur. § 1304. But that peculiar discretionary power, whatever it may have been, that belonged to the king, and was exercised by an implied legal deputation, as in the case of charities, has never been regarded in America as a part of the judicial power properly so called or vested in any court, except where it has been done directly by the action of the legislature. It is very certain that we have no original chancery jurisdiction. We have only such powers as the Constitution gives us. Neither Constitution nor statute has given us this. Neither have we any power to determine by our discretion that the custody of a child may be placed where we see fit to place it. Any such power, as pointed out by Judge Bronson, in *Mercein's Case*, 3 Hill, 399, would destroy the family relations entirely. There are many childless people who might very possibly be better parents than those who have children, and any doctrine which would sustain the views of my brethren in this case would authorize us to make a new distribution of children, and deprive them of their homes. The children of our State are not in the position of children of the people, and this Court is not the arbiter of their destines as such, and it will be a sad day for our civilization

when they are so treated. If the family is not respected, there will be no hope for the State.

Respondents, among other things, set up that just after the child's mother died the father turned over the infant to the maternal grandmother, and relinquished his own rights. I do not think there is any foundation for this claim. That he allowed her temporary charge is not disputed. But he always insisted on keeping her, and Mrs. Shaw gave him a positive agreement to return her before he would let her take the child back. This she now claims she resorted to as a subterfuge to get possession. There could have been no need of deceit if there was any valid agreement. Courts in Washington have full power over all matters arising there, and if such an agreement was made, and was valid, it is not presumable they would not do justice. But I think that if the agreement was made, which I do not believe, it was utterly void. Mrs. Shaw, as a married woman, had no power to make such a bargain, and it could not be enforced against her. But, further than this, the relations between parents and children cannot be changed without legal authority. The father's duty to his child and to the public is fixed by public policy as indissoluble, except in the few cases provided by statute. An agreement, with or without consideration, to give up a child to any third person, even a near relation, cannot bind any one. The child cannot consent to it. The parents' duty cannot be shaken off. It has been recognized as void on plain grounds of public policy. See *Reg. v. Smith,* 16 Eng. Law & Eq. 221. Also *Kennedy v. May,* 7 Law T. (N. S.) 819, cited 2 Story, Eq. Jur. § 1347 (*c*). In this latter case there was a written agreement between competent parties, a father and a widowed grandmother, but it was held void and illegal.

In cases of adoption, when allowed by law, the infant's rights are carefully protected, and so in apprenticeship.

But in such a case as the present, had the father lived, and Mrs. Shaw died, it is manifest that the infant must either go back to a father whom she has been taught to hate, or be without any responsible protection. The relation would be as effectually broken up for all the usual family ties as if it had never existed.

There is one feature of the controversy which cannot be ignored. From the beginning of this dispute until now respondents have done all that was in their power, not only to keep the child, but to blacken the character of its father and his parents, and in doing so have made atrocious charges, affecting to some extent the mother also. I think the testimony of this man's character where he was best known, and the proof of his official as well as personal standing, indicate that the whole charge against his life in Washington is unfounded, and a cruel slander. But whatever may have been the imagined policy of it when he was living, it ceased when he died, and left representatives who are certainly good people. If this infant remains where she is, the result of this proceeding and the broadcast and unproved imputations set out in the record cannot fail hereafter to fix a stain on the child herself, and make her ashamed of her parentage. I do not think such conduct is excusable, even in the desire of these persons to retain a child whom they love, and no doubt wish to befriend. The consequences are cruel, and, if the child grows up with the natural feelings of humanity, will give her very bitter memories.

In the present case the guardians appointed by the District of Columbia court applied to the proper department for the money due the estate from the government, and after a careful investigation the Interior Department sustained their claim as against respondents. I do not regard the property question as one of primary importance, but it is after all the only estate which this child is at all

sure of having. But when we attempt to practically annul an appointment depending on the laws made by Congress to govern the District, not because it is illegal, but because we think we can make a wiser arrangement than that which the will and the law made, we, in my opinion, are usurping authority, and doing injustice.