## HUMMEL v. PARRISH, et al.

No. 2456. Decided August 16, 1913 (134 Pac. 898).

1. HABEAS CORPUS—CUSTODY OF MINOR—WELFARE OF CHILD. The evidence in *habeas corpus* proceedings by a mother to obtain the custody of her child *held* sufficient to support the finding of the trial court that the mother had abandoned the custody of the child to others without intention of reclaiming it, and that it was for the best interests of the child that it should remain with its adoptive parents. (Page 379.)

2. HABEAS CORPUS—CUSTODY OF MINOR—WELFARE OF CHILD. Though the presumption is that it is for the best interests of the child and of society that it shall remain with its natural parents during minority, where a parent has surrendered her child to others in infancy and it has been allowed to remain with others until new ties of mutual affection are formed, the child's welfare will control the parent's rights in *habeas corpus* proceedings for its return.[1] (Page 382.)

STRAUP, J. dissenting.

APPEAL from District Court, Second District; *Hon. N. J. Harris,* Judge.

Application by Catherine Lambing Hummel for a writ of *habeas corpus* against Samuel J. Parrish and Caddie R. Parrish to obtain the custody of her minor child. From an order awarding the custody of the child to the defendants, plaintiff appeals.

AFFIRMED CONDITIONALLY.

*M. E. Wilson* for appellant.

*M. Thomas* for respondents.

### APPELLANT'S POINTS.

The presumption is that the parent is a fit and suitable person to be entrusted with the care of his children and that

---

[1] Stanford v. Gray, 42 Utah, 228, 129 Pac. 423.

the interests and welfare of said children are best subserved when under such care and control. (*Wilson v. Mitchell,* 111 Pac. 23, 30 L. R. A. N. S. 511; *Miller v. Miller,* 123 Ia. 165, 98 N. W. 631; *Swarens v. Swarens,* 97 Pac. 968; *State v. Martin,* [Minn.] 103 N. W. 888; *Terry v. Johnson,* [Neb.] 103 N. W. 318; *Hibbette v. Bains,* 78 Miss. 695, 51 L. R. A. 839.)

Before the legal right of the parent to the custody of the child will be ignored or invaded by the court, it must be established by plain and certain proofs either that the parent is unfit to be entrusted with the care of minor children or that he has abandoned the child and surrendered its care and custody to the respondents. And he who seeks to withhold the custody of a minor child from its natural parents has the burden of establishing either unfitness or abandonment. (*Wilson v. Mitchell, supra; Hibbette v. Bains, supra; Wier v. Marley,* 99 Mo. 484, 6 L. R. A. 672; *Norvall v. Zingmaster,* 57 Neb. 159, 77 N. W. 373.)

The natural guardian of a bastard child is the mother, and unless it appears by clear and satisfactory proof that she is manifestly unsuited to give it proper training, or that she has surrendered the child to respondents substituting them in her own place so that they stand *in loco parentis* to the child, and that she has continued this condition of affairs so long a time that a severance of the relationship between the child and respondents would surely be detrimental to the child then clearly she is entitled to its custody. (Rodgers on Domestic Relations, Sec. 569; Tiffany's Persons and Domestic Relations, Sec. 113; *Ex Parte Byron,* 74 Atl. 488; Church on *Habeas Corpus,* Sec. 454.)

Persons other than parents, unless appointed guardians in due from of law have no right as a rule to the custody of the children of another. (Rodgers on Domestic Relations, Sec. 570.)

The mere fact that the respondents are worth fifteen thousand dollars and that petitioner is comparatively poor cannot be considered a sufficient reason for denying the custody of the child to the petitioner. (Rodgers on Domestic Relations,

Sec. 568; *Dunkin v. Seifert*, [Ia.] 98 N. W. 558; *In re Neff*, [Wash.] 56 Pac. 383; *Swarens v. Swarens, supra*.)

## RESPONDENTS' POINTS.

Where a parent has parted with the custody of a child, and subsequently seeks to break up formed ties of affection, such case is no longer to be viewed in the light of the parent's legal rights, but in the light of a careful regard of the welfare of the infant. (*Peese v. Gellerman*, [Tex.] 110 S. W. 196 and cases cited; *In re Vance*, [Cal.] 28 Pac. 229; *Sheers v. Stein*, [Wis.], 5 L. R. A. 781; *Fields v. Deming*, 105 Pac. 486, *Legate v. Legate*, [Tex.] 28 S. W. 281.)

## STATEMENT OF FACTS.

Catherine Lambing Hummel filed a petition in the district court of Davis County, this state, for a writ of *habeas corpus* against the defendants, Samuel J. Parrish and Caddie R. Parrish, to obtain the care and custody of her minor daughter Catherine Lambing, who, plaintiff alleges, was being unlawfully restrained of her liberty by defendants. The writ was issued and due return made thereto. The court, after hearing the evidence, awarded the care and custody of the child, who at the time was nine years of age, to defendants. Plaintiff appeals.

The facts and circumstances out of which the controversy over the custody of the child arose are about as follows:

The child was born to appellant out of wedlock, at Budapest, Hungary, on February 13, 1903. Appellant nursed and personally cared for the child until it was from twelve to fourteen months old, when she took it to the home of her mother, Sophia Lambing, who then lived at Tamesvar, Austria-Hungary. The child remained at Tamesvar in the care and custody of its grandmother until 1905, when the grandmother emigrated to the United States, bringing with her the child. The grandmother, Sophia Lambing, was called as a witness for respondents and testified in part as follows: "I know the little child in question. Mrs. Hummel (appel-

lant) brought it to my home in 1904 in Tamesvar. My daughter (appellant) brought the child over to my house .. . . and gave it to me. She was living at Budapest at that time. She came and left the baby and went out. She had no money and could not care for the child. She went out dancing every night and spent all the money. She worked out at housework. She came home on Sundays, sometimes came for an hour and then go away. She did not bring any food or clothing for the little baby. One Christmas she brought the child clothes for a Christmas present. When the child was in need of clothes I made her some. . . . I came to Cincinnati in 1905. I arrived there about the first part of July, 1905. Before I left Tamesvar, Katie (appellant) said I could take the child with me to Cincinnati and she said when she could she would like to come to Cincinnati too. She could not raise the child in Tamesvar, and I took the baby with me so it could not go to the poorhouse. I got (borrowed) $20 from a lady to pay on the boat . . . for the child's passage to America. . . . "

Witness further testified that Katie (appellant) did not pay or contribute anything towards defraying the expenses of bringing the child to this country; that after she arrived in Cincinnati she occasionally received a letter from appellant but no financial aid for the care and support of the child; that after she had been in Cincinnati for about six months appellant ceased writing to her and there was a period of about five months in which she received no word by letter or otherwise heard from appellant; that finally one of her daughters, who also resided in Cincinnati, received a letter from a friend in Hungary informing her that appellant was dead.

The evidence without conflict shows that, during the time the child was with its grandmother in Cincinnati, appellant did not furnish or contribute anything towards its support. A few months after the grandmother arrived in Cincinnati with the child, she met one Ben E. Rich, of this state, who informed her that his sister, Caddie R. Parrish, one of the respondents herein, desired to adopt a little girl and would

no doubt be pleased to take the child and give it a home. The grandmother, believing that the mother of the child was dead and desiring to place the child in a good home where it would be properly cared for, reared, and educated, signed an instrument in writing whereby she relinquished all her right to the care and custody of the child. The relinquishment recited in substance that the grandmother was the legal and rightful guardian of the child in question, and that the child's father and mother were both dead, and that she (the grandmother) relinquished all right and claims conferred by the powers of her guardianship over the child, and that said claims and rights pertaining to said guardianship were to be vested in the person of Caddie R. Parrish of Centerville, Davis County, Utah, and that said Caddie R. Parrish was to become the legal and rightful guardian of said child with the understanding that she was to receive said child as her legally adopted child, and that she was to care for the child "Katie Lambing in a way befitting a kind and considerate and loving mother and . . . to properly care for the comfort and welfare of and to educate the said Katie Lambing until she comes to the years of her majority."

Immediately after the execution of the relinquishment, Mary Lambing, a daughter of the grandmother, left Cincinnati with the child and came to Utah for the purpose of delivering it to the respondents. The respondent Samuel J. Parrish met Mary Lambing at the depot on her arrival in Salt Lake City with the child and took them to his home in Centerville. The Parrishes, respondents, neither of whom had seen the child before it arrived in Salt Lake City, received the child and ever since have had the care and custody of and control over it with the exception of a few days, during which time it was with its grandmother, Sophia Lambing, who came to Salt Lake City a few months after the child was placed in the home of respondents.

Appellant testified that during the time the child was left with its grandmother in Tamesvar, Hungary, she contributed ten dollars per month to its support, and that at the time her mother departed from Tamesvar with the child for

America she gave her mother twelve dollars for the child. She further testified that she never intended to, nor did she at any time, relinquish her right to the care and custody of the child. Soon after the child was brought to Utah and placed in the home of respondents, appellant's mother and her other relatives in Cincinnati received word from Hungary that appellant was still alive.

The court, among other things, found, and the findings are supported by the evidence, that "shortly after the child was taken to the Parrishes the daughter (appellant) came to America and upon her arrival at Cincinnati learned that the child had been given away. She made some effort by way of correspondence to secure the possession of her child at that time, and a year later came to Utah, visited the Parrishes, and requested that the child be delivered to her. Upon refusal she returned to Cincinnati. No further attempt was made to obtain possession of the child in a legal way, and for several years she was permitted to remain with the Parrishes without any demand for its return to its mother." Appellant testified that the reason she delayed coming to Utah and demanding the child for nearly a year after her arrival in Cincinnati was that she was without money and was therefore compelled to delay the trip until she could earn sufficient money to defray the expenses of the trip. As found by the court, no further steps were taken by appellant to get possession of the child "for several years or until 1911."

In July, 1911, appellant was married to John Hummel. Immediately after the marriage appellant and her husband moved to Salt Lake City. On their arrival in this city they were met at the depot by appellant's sister, Mary Walters, and other relatives and taken to the home of appellant's mother. Mary Walters was called as a witness by respondents and testified that when she met the Hummels at the depot appellant requested her to say nothing to Mr. Hummel about the child "because he didn't know she had a child," and that appellant also stated that "she had decided to leave the child with the Parrishes until it was old enough to choose for itself." Appellant denied making any such statements

and testified that she informed her husband before she was married to him of the existence of the child and that it was born out of wedlock. Hummel testified that he knew of the child before he and appellant were married; that when they arrived in Salt Lake City they went to the home of appellant's mother, Sophia Lambing, and lived there for five or six weeks; that during this time "nothing was said about the child." Some six or seven weeks after the Hummels arrived in Salt Lake City they made a demand on respondents for the possession of the child. Respondents refused to deliver the child to them.

McCARTY, C. J. (after stating the facts as above).

Samuel J. Parrish is a farmer and is the owner of a valuable farm and a good home in Centerville. The evidence shows and the court found that "the Parrishes are well-to-do people, cultured and refined, capable in every way of rearing and taking care of the child in the very best manner and providing it with an ideal home. They are people of middle age (Samuel J. being fifty-six and Caddie R. Parrish fifty-three years of age), have no children at home of their own, and have become very much attached to the child, more so than its real mother, and the child is very much attached to them."

The court, in rendering its decision, also made the following observations, which were fully warranted by the evidence:

"In 1911 petitioner (appellant) married John Hummel and moved to Salt Lake. She was met at the depot by her sister (Mrs. Walters) and other relatives to whom she stated she did not desire her husband to know anything about the child; that she had decided to let it remain with the Parrishes until it was old enough to choose for itself. It is apparent, therefore, that the mother's attachment for the child was not so great at that time as she now claims. She and her husband are also in rather humble circumstances. She goes out washing several times a week, and, while it is claimed they have some money on deposit, it is questionable in the

mind of the court whether she is able to properly care for the child or whether she is a proper person to have the custody thereof. . . . The difficulty with the court has been whether it should disregard the welfare of the child and consider only the natural right."

It seems that the court, in rendering its decision denying the writ, proceeded upon the theory: First, that appellant had surrendered and delivered the child into the care and custody of its grandmother; and, second, that it would be for the best interest of the child for it to remain in the care and custody of the respondents.

It is earnestly contended that the evidence wholly fails to show a surrender of the child by appellant to Sophia Lambing, or that she ever intended to or did in effect abandon the child or in any way waive or forfeit her right to the care and custody of the child. And it is further contended that the evidence fails to show that the interests and welfare of the child would be best subserved by permitting it to remain with respondents, and that the court erred in so deciding. The evidence without conflict shows that appellant, when the child was not more than fourteen months of age, placed it in the care and under the control of its grandmother, Sophia Lambing, who kept and cared for the child for about one year in Hungary before bringing it to America. During this time appellant "worked out" but came home on Sundays, sometimes for an hour, to see the child. The grandmother testified that during the time the child was left with her in Hungary appellant did not pay or contribute anything for its support, and that appellant requested her to bring the child with her to America. While appellant admitted that she consented for her mother to bring the child with her to this country, she denied that she failed to contribute anything for its support. The trial court, however, found against appellant on this last point. In rendering its decision, the court, among other things, made the following observations regarding the reliability of the mother's testimony as compared to that given by her daughter, appellant herein.

"The mother's testimony all through seems to me to be the more reasonable. Furthermore, I cannot conceive that she should fabricate her entire testimony and commit willful perjury to deprive her own daughter of the custody of the child as against strangers in whom she has no interest. I prefer, therefore, to believe the mother's testimony as against that of her daughter."

Taking into consideration the indifference of appellant for the welfare of the child after it was brought to this country by the grandmother, as shown by her failure to contribute to its support, and in failing to even write to her mother and other relatives in Cincinnati about the child for a period of about five months, and permitting the child to remain with respondents for more than five years before commencing proceedings to recover possession of it, we think the conclusions reached by the court regarding the reliability of the grandmother's testimony as compared with that given by her daughter on this point were amply justified Moreover, Mrs. Walters, appellant's sister, testified that when the Hummels arrived in Salt Lake City, July, 1911, she, in company with other relatives met them at the depot and appellant requested her not to say anything about the child to Mr. Hummel "because he didn't know she had a child," and that a little later, on the same day, appellant said to her that she had decided to leave the child where it was until it should be able to decide for itself as to whether it would remain with respondents or return to appellant. Appellant, as we have hereinbefore observed, denied making these statements, but the court found as a fact that she did make them. And we think that the court was warranted in so finding. Hummel testified that during the four or five weeks that he and appellant lived at the home of Sophia Lambing after their arrival in Salt Lake City the child was not mentioned by either of them; that about one or two weeks after they had left the home of Sophia Lambing and were maintaining a home of their own he went to Mrs. Lambing for information concerning the whereabouts of the child. Appellant knew, and had known for four or five years, that the child was at the

home of the Parrishes in Centerville.   Now, if it were true, as testified to by appellant and Hummel that they had conversed between themselves about the child and the conditions under which it was born before they were married, and that their purpose in coming to Utah was to get the control and custody of the child, the question arises:   Why did they, after arriving in Salt Lake City, remain silent regarding the object of their quest for six or seven weeks?   And then when they did finally decide to move in the matter, why was it necessary for Hummel to go to the grandmother of the child for information about the child which could have been furnished by appellant?   The trial court evidently believed, and it was justified in believing, that Hummel never heard of the child until several weeks after he and appellant arrived in Salt Lake City, July, 1911, and that the claim made by them that they talked about the child before they were married and that the object they had in view in coming to Utah was to get the child was an afterthought, a "frame up" on their part to make it appear that appellant never intended to abandon the child or waive her right to its care and custody, and further to try and make it appear improbable that she made the statements attributed to her by her sister Mrs. Walters that she had decided to leave the child with respondents until it was old enough to decide for itself as to whether it would remain with them or return to appellant.   We have examined the record in this case with care and are satisfied that the greater weight of the evidence tends to show that appellant abandoned the child to the care and custody of others without any intention on her part of reclaiming it, and that the trial court did not err in so deciding.

The legal presumption is that it is for the best interests of the child and of society for the child to remain with its natural parents during the period of its minority and be maintained, cared for, and educated by them and under their supervision and direction.   But this is not an absolute right of the parent.   The decisions rendered in this class of cases almost universally hold that where, as here, a parent has surrendered the control of his child when

it was a toddling infant to other parties, and permitted them to maintain, clothe, feed, and care for it until it is eight or nine years of age, and a strong reciprocal mutual affection has grown up between the child and its foster parents, as in the case at bar, and the parent seeks to recover possession of the child, the natural or presumptive right of the parent cannot prevail if the interests and welfare of the child forbid it. The law in such cases regards the welfare and permanent interests of the child much more important than the natural or presumptive right of the parent. In other words, the paramount consideration in such cases is the well-being of the child. If it appears to the court that the physical, intellectual, social, moral, and educational training and general welfare and happiness of the child will be best promoted by leaving it with the foster parents, the presumptive right of the natural parent must yield to the interests of the child.

The general and, as we think, correct rule is well illustrated in the case of *Smidt v. Benenga,* 140 Iowa, 401, 118 N. W. 440, in the following language:

"Generally speaking, the natural parents are entitled to the care, custody, and control of their minor children; but they may by agreement or conduct deprive themselves of this natural right and confer it upon others. And when the scales are equally balanced, or the court is in doubt about the abstract right of control, the interests of the child are paramount and will prevail. We do not wish to in any way throw doubt upon the paramount right of a father to the custody of his offspring; but where he has neglected to assert that right for many years, and the child knows him not, but has formed other attachments which are almost as sacred as the natural ones, and in effect quite as strong, courts are reluctant to make any change, particularly where, as here, these attachments were formed with the consent of the natural parent."

In *Clark v. Bayer,* 32 Ohio St. 299, 30 Am. Rep. 593, it is said:

"In this country there is quite a uniformity in the decisions in relation to the rightful custody of infant children. The general spirit of modern adjudged cases on this subject, both in England and the States, does not essentially differ. As a general rule, the father is considered as being entitled to the custody of his minor children. . . . In cases of controverted custody, the present and

future interests of the minor control the judgment and direct the discretion of courts. While the legal rights of parents are to be respected, the welfare of the minor is of paramount consideration. . . . It sometimes happens that parents have abandoned their minor children, or by act and word transferred their custody to another. In such cases, where the custodian is, in every way, a proper person to have the care, training, and education of the infant, and the court is satisfied its social, moral, and educational interests will be best promoted by remaining in the custody of the person to whom it was transferred, or received, when abandoned, the new custody will be treated as lawful and exclusive. After the affections of both child and adopted parent become engaged, and a state of things has arisen which cannot be altered without risking the happiness of the child, and the father wants to reclaim it, the better opinion is that he is not in a position to have the interference of a court in his favor. His parental rights must yield to the feelings, interests, and rights of other parties acquired with his consent."

This doctrine was recognized and approved in the case of *Stanford v. Gray*, 42 Utah, 228, 129 Pac. 423, recently decided by this court. In addition to the authorities there cited we invite attention to the following cases in which the principle was adhered to and followed: *In re Stockman*, 71 Mich. 180, 38 N. W. 876; *Jones v. Darnall*, 103 Ind. 569, 2 N. E. 229, 53 Am. Rep. 545; *United States v. Green*, 3 Mason, 482, Fed. Cas. No. 15,256; *Schneider v. Schwabe* (Tex. Civ. App.) 143 S. W. 265; *Stringfellow v. Somerville*, 95 Va. 701, 29 S. E. 685, 40 L. R. A. 623; *Kelsey v. Green*, 69 Conn. 291, 37 Atl. 679, 38 L. R. A. 471; *Sturtevant v. State*, 15 Neb. 459, 19 N. W. 617, 48 Am. Rep. 349; *Fields v. Deming*, 56 Wash. 259, 105 Pac. 466.

The trial court saw the parties in this proceeding, including the child in question, heard appellant and her husband and each of the respondents testify, observed their appearances, their manner of testifying, their general deportment, and the way in which the respective parties demeaned themselves in and about the courtroom during the trial, all of which no doubt impressed the court and materially aided it in determining the issues involved, because, in rendering its decision, the court made the following observation:

"Certainly from appearances in the courtroom, if the welfare of the child only is considered, the court would not take the child and place it with its parent."

The evidence is undisputed that the child has been and is being well and kindly treated by respondents, and that it is happy and contented and desires to remain with them. And there can be no question but that the child's physical, moral, intellectual, and educational training will be all that could be desired if it remains with the respondents. Upon the other hand, appellant is uneducated and speaks the English language very imperfectly. She and her husband have no home of their own and live in a rented house of three rooms only. Hummel earns a livelihood by his daily labor and is capable of earning from $2.50 to three dollars per day when employed. Appellant testified that she "goes out washing and does needle work." In fact, the record shows that they are industrious, hardworking people, which is commendable and speaks volumes in their favor. It is, however, apparent that appellant has neither the facilities nor the time to give the child the care and the attention that it requires and should receive. Moreover, appellant and her husband are, comparatively speaking, young people, and children may, and probably will, be born to them. Should this occur, the unfortunate circumstances under which the child in question was born would, to say the least, tend to make its welfare and happiness a matter of secondary consideration with Hummel. Let that be as it may, the most that can be said in favor of appellant's contention is that the effect that a change in guardianship of the child from respondents to appellant would have on its future welfare and happiness is problematical only; the probabilities being that a change under the circumstances would be detrimental rather than beneficial to the interests and future welfare of the child.

The facts in this case are somewhat similar to the facts in the case last above cited (*Fields v. Deming*). In that case a child about nine months old that was born out of wedlock was left by its mother at a place which the mother was in-

formed was a "child hospital." The mother testified that she "did not intend to do more than to leave the child at the hospital for a short time and until she should be able to take care of it herself; that in about three weeks from the time she left it, she went to see the child and was informed that it had been placed in a family." About two years thereafter (in 1898) the mother commenced legal proceedings to regain the possession and custody of the child. Issues were joined, but the case never came on for trial and was finally dismissed. No further action was taken by the mother until June, 1908, when she again commenced an action to get possession of the child. A trial was had and the court there, as here, found that it was to the best interest of the child to remain in the care and custody of its foster parents. The Supreme Court of Washington affirmed the decision. The reasoning of the court in that case completely answers the argument and contention made by appellant in the case at bar. The court, after reviewing the facts, in part said:

"It is not proper to consider the material wealth possessed by either the natural or foster parents or to make comparisons in that regard; . . . at the same time it must be apparent that, where a child has been brought up by foster parents in an environment that is distinctly different from the environment to which he would be submitted by a change of guardianship, a revulsion of feeling would be liable to occur which would lead to embarrassments and misery. In this case, looking at the question strictly from the standpoint of the boy's welfare, the mother would not be able to give him the attention which at this age he sadly stands in need of. . . . And if he were uprooted from the home and affection which now warm and protect him, and transplanted to the environment described by the mother as her home, the probabilities are that it would result in discontent and misery to both mother and son."

So, in this case, to take the little girl (now ten years of age) from her present happy home and the refined, congenial, the elevating influences with which she is surrounded and give her into the care and custody of those whose social environments, way and style of living may be, and probably are, materially different from that to which the child is, and during the last seven or eight years of her life has been, ac-

customed would probably tend to have a blighting rather than a benign influence on the child and her future career.

Counsel for appellant in their brief invite attention to the fact that respondents have taken no steps to adopt the child. Counsel for respondents, in their oral argument of the case, stated, by way of explanation of this apparent oversight or neglect on the part of respondents to carry out their part of the agreement under which they obtained the custody of the child, that no steps had been taken by respondents in this regard because they were uncertain as to whether they could legally adopt the child without the consent of its mother. Under present conditions, the legal status of the little girl is nothing more than that of a homeless waif living on the charity of those who are under no legal obligations whatever to support and care for her.

The order of this court is that the judgment of the lower court be affirmed, provided respondents proceed within thirty days after receiving notice of the filing of this opinion to procure an order from the district court of Davis County permitting them to adopt the child as provided by statute; and this opinion will be sufficient authority for the district court to make an order permitting respondents to adopt the child. Should respondents fail to apply for the order mentioned within the time above specified, the district court of Davis County is directed to set aside the judgment heretofore rendered and enter and make such order regarding the custody of the child as it may, under the statute, deem meet and proper for the best interests of the child. The respective parties to pay their own costs incurred on this appeal.

Since the foregoing was drafted as the opinion of this court, it has been suggested in a dissenting opinion that "it is not made to appear that the appellant is an improper or unfit person to rear the child." But that on the contrary "it is shown that she is a proper and fit person to rear the child," and that therefore she is entitled to its custody. The trial judge, in rendering the decision denying the writ, said:

"It is a question in the mind of the court whether she (appellant) is able to properly care for the child or whether she is a proper person to have the custody thereof."

We did not review nor comment upon the evidence which undoubtedly prompted the court to make these observations and which tended to show that appellant, during at least a part of the time that her child was being supported and cared for by others, was wayward and somewhat, if not wholly, indifferent to the then present as well as the future welfare of the child. We thought, and still think, as undoubtedly the trial court believed, that it would be for the best interests of all concerned to cover appellant's past in that regard with the mantle of charity, and not perpetuate it by referring to it in this opinion. But, since it is in effect claimed that there is no evidence tending to show "that appellant is an improper or unfit person to rear the child," we feel impelled to invite attention to the evidence which, if believed by the court (and it affirmatively appears that the court did at least give it some credence), tended to show that, while appellant may not be wholly unfit to have the care and custody of the child, we think it conclusively shows that the present and future welfare of the little girl will be best subserved by leaving her with respondents, surrounded as she is with all the necessary material comforts of life as well as an elevating, congenial, and moral atmosphere in which she is happy and contented.

Sophia Lambing (appellant's mother) testified that, after the child was left with her in Hungary, appellant, "went out dancing every night and spent all the money; . . . that she came home on Sundays sometimes and for an hour and brought bad girls;" and that she said to appellant, "I don't want those bad girls in my house." The witness also testified that when appellant first came to Utah (1907) in quest of the child she had a conversation with appellant regarding the child, which was in part as follows: "Q. You told Katie (appellant) she could not have the child, didn't you? A. Well, she was here and going back to Hungary with this child and I told her, 'What will you do in Hungary with this

little child? Going in a poorhouse?' And she says, 'She can be a —— (making use of a word sometimes used to characterize or designate a lewd woman), what I am.'" Counsel for appellant vigorously contend that this testimony is wholly unworthy of belief and ought not to be considered. It was, however, for the trial court to determine what weight, if any, should be given to this testimony, and it would seem from the remarks of the judge in rendering the decision that he gave it some credence.

Gertrude Pleiffer, another witness for respondents, testified in part as follows:

"Reside in Salt Lake City. Knew Katie Lambing Hummel in Hungary. . . . Had a conversation some time in November with Katie Hummel. . . . I said, 'Katie, you leave the child where it is now. It is a good place.' I said, 'What are you going to do with the child?' Katie says, 'After I get the child it don't matter to me what becomes of the child just so I get the child, even if the child is going to be where I am.'" On cross-examination the witness, among other things, said: "She (appellant) said she could take care of the child and raise it until it became what she was." And the undisputed evidence shows that a few weeks after appellant and her husband came to Salt Lake City and made their home with the appellant's mother, Sophia Lambing, a quarrel arose between appellant and her mother because of the unclean condition in which appellant kept the room occupied by her and her husband, and because of this they left Mrs. Lambing's home and obtained lodging elsewhere. This circumstance of itself would not be sufficient to justify the court in denying the writ, but it nevertheless is a circumstance which the court might well consider in connection with all the other facts and circumstances in determining whether it would be for the best interests of the child to take it from its present refined and ideal home and give it into the care and custody of those who are thus shown to be careless and indifferent of the condition and appearances of their home and are lacking, if not wholly wanting, in the culture and refinement which surround and will continue to sur-

round the child so long as it remains and makes its home with respondents. Of course, if the interests, claims, and legal rights of the parties to the proceedings as between themselves only are to be considered, regardless of the effect that the determination of these legal rights may have on the present and future welfare of the child, the circumstance last referred to should not be considered by the court. But, as we have stated, the more recent authorities, which include the best reasoned decisions on the subject practically all hold that the interest and welfare of the child in cases of this kind, where the parent in effect abandoned the child when it was a toddling infant and others have supported and cared for it until it is nine or ten years of age, the interests of the parent must yield to those of the child, and any fact or circumstance admitted or established by the evidence, that will assist the court in determining this paramount question may and should be considered by it.

According to appellant's own testimony, after she gave the child into the care and custody of her mother she earned twelve dollars per month in Hungary and was able to and did save ten dollars per month which she gave to her mother for the support of the child before it was brought to this country. Notwithstanding her ability, as she claims, to save and lay aside ten dollars per month of her earnings, she did not contribute anything towards the support of the child after it left Hungary, and for five years after she came to America she did not pay or contribute anything for its support. And the evidence without conflict shows that during the first six or seven weeks after she and her husband arrived in Salt Lake City (July, 1911) she made no effort to see or to get possession of the child. And, so far as shown by the record, the only occasion during that time that she mentioned the child, if she mentioned it at all, was the day on which she and her husband arrived. The trial court, after reviewing these circumstances in rendering its decision, remarked and in effect found "that the mother's attachment for the child was not so great at that time as she now claims." We have again referred to this part of the record because it tends to show a lack of in-

terest and an indifference on the part of appellant towards the child, which is inconsistent with the claim made that, so far as she is concerned, her attachment for the child overshadows every other element in the case. The court might well have concluded, in view of the fact that appellant's earning capacity was such that it enabled her to save and lay aside ten dollars per month of her earnings, and that she waited more than five years after she was advised that the child had been given to respondents for adoption by them before commencing legal proceedings to get possession of it, and that during this time she contributed nothing for its support, and her indifference towards the child for six or seven weeks after she arrived in Utah (July, 1911), that she was prompted by a selfish rather than a generous motive to commence these proceedings. The little girl was, at the time these proceedings were commenced, eight years of age and would soon be able to materially assist her mother in general housework and in looking after the home. As stated, the court might well have concluded that it was the material benefits to appellant that would inure to her by regaining possession of the child rather than a desire on her part to further its interests that prompted her in these proceedings.

After a careful and thorough examination of the record in this case, we are not prepared to say that the trial court would not be warranted in finding that appellant, under the peculiar circumstances of this case, is not a proper person to have the care and custody of the child, even though the Parrishes should waive all claim to it. We therefore reaffirm the order hereinbefore made in remanding the cause to the trial court.

FRICK, J.

I concur with the Chief Justice. If I followed my natural inclinations as a parent and considered nothing save the legal rights of the mother, the appellant here, I should perhaps arrive at a different conclusion. Most cases like the one at bar would be comparatively easy to determine if one were inclined to regard the naked legal rights of the parent only.

Courts in such cases, however, have a higher duty to perform than to merely discover and enforce the naked legal rights of the parents. In the case at bar the evidence convinces me that the mother's present desire to obtain custody of her child is not wholly unselfish. It is well-nigh impossible to read the record and arrive at a different conclusion. The child in question, as the mother well knows, is a female child without a name; and, had it not been for the good offices of her grandmother, I cannot doubt but the child would have lost her identity in a European poorhouse or orphan's home. It was the grandmother, and not the mother, who rescued the child from oblivion. It was the former who was instrumental in placing her into the custody of the respondents, who for more than five years have provided, and will continue to provide, the child with that which is of more importance than wealth, namely, good moral training and an education such as will enable her to meet the demands of society and to take care of herself if it should become necessary when she develops into womanhood. Moreover, they will give her a name and a standing in the community where she is brought up. In short, the child, if she is permitted to remain in the custody of respondents, will receive all the benefits and advantages that any child of honest parents, with moderate, though sufficient means, would receive in this commonwealth. Upon the other hand, if she is placed into the custody of appellant, in case other children should be born to her, the child no doubt will always be regarded as one not of the family. Further, as the Chief Justice has pointed out, the child now knows only of one home and recognizes the respondents as those who are nearest to her. Her own mother is, comparatively speaking, a stranger to her. A stranger not only in acquaintance, but a stranger with respect to her habits and mode of life. In taking the child away from respondents, therefore, it would be to take her away from her friends and place her among strangers, who to her would have strange ways. This would be a gross injustice to the child in view that she has now reached the formative period of her life. What this would mean to the child,

the mother ought to know and appreciate. Her desire for the custody of the child, therefore, cannot spring from pure motherly love, but must be based upon something else. Again, the record conclusively shows that the mother's past conduct was not such as inspires one to believe that she has a very exalted conception of what a young woman's conduct and deportment should be. While, so far as the mother is concerned, one may well overlook her error, yet, when one is charged with determining the welfare of a young girl, one may well hesitate before taking her from a virtuous and in all respects desirable home and expose her to at least unknown conditions and surroundings. Conceding, therefore, the naked legal rights of the mother, yet I have not the slightest hesitancy in saying that the record is conclusive that the best interests of the child and the equities of the respondents far outweigh those legal rights. Under such circumstances, we owe it to the child, to the state, and to ourselves not to permit any experiments with respect to the welfare of a young girl who is nameless and helpless and must look to us alone for protection.

STRAUP, J. (dissenting).

Considering the record in its entirety, I think it is not made to appear that the appellant, in law or in fact, abandoned or surrendered the child to her mother, Sophia Lambing; that it does appear that Sophia Lambing, without authority, without right, and without the knowledge and consent of the plaintiff, surrendered and delivered the child to the respondents; that it is not made to appear that the appellant is an improper or an unfit person to rear the child or that she is unable to properly maintain and care for it. To the contrary, I think it shown that she is a proper and fit person to rear the child, and that she and her husband are able and both willing to support, maintain and care for it; that the respondents had not legally adopted the child and have taken no steps to adopt it; and that the plaintiff has not been guilty of laches in asserting her rights to the possession and custody of the child. I therefore think the ap-

pellant is clearly entitled to the child's custody, and that the court erred in awarding it to the respondents.