## WALLICK v. VANCE.

No. 4896.   Decided June 28, 1930.   (289 P. 103.)

210

*Robinson & Robinson*, of Provo, for appellant.

*M. B. Pope* and *A. B. Morgan*, both of Provo, for respondent.

EPHRAIM HANSON, J.

This is a case involving the custody of Kathryn Vance, a young girl born March 17, 1917. The defendant is the father of the girl. Plaintiff is the girl's aunt and sister of defendant.

Plaintiff avers that when Kathryn was less than a year old her mother died of tuberculosis; that when the child was thirteen months of age defendant brought it to Memphis, Tenn., and by oral gift committed the child to the permanent custody of his mother, Nora Vance, and his sister, the plaintiff. This was in April 1918. Plaintiff further avers that since that time she and her mother, with the assistance received from Martha Vance Farrer, sister of plaintiff residing at Provo, Utah, have provided for and maintained the child; that much of that time the child was in exceedingly poor health; that plaintiff has paid for all the medical aid and assistances rendered in the child's behalf; that in July 1923, plaintiff brought Kathryn from Memphis, Tenn., to Provo, Utah, where plaintiff has since lived; that the child was taken back to Memphis, Tenn., on February 13, 1925, by its grandmother; that in July, 1927, Kathryn was again in poor health and had symptoms of tuberculosis; that a physician advised the grandmother and the plaintiff, who at that time was at Memphis on a visit, that a change of climate would be beneficial to the child;

that by and with the consent of her mother the plaintiff brought Kathryn back with her to Provo, where she now is; that mutual attachments have grown up between plaintiff and Kathryn so that to separate them at this time would cause them both to suffer great sorrow and grief; that the defendant has not contributed anything whatsoever to the support and maintenance of the child since he committed it to the care and custody of plaintiff and plaintiff's mother. Allegations are also made to the effect that defendant is now in the state of Utah and threatens to take possession of Kathryn in order to take her back to Memphis, Tenn., and that, unless enjoined by order of court, will do so in utter disregard of the child's health.

Upon the foregoing complaint a temporary injunction was issued by the judge of the district court of Utah county enjoining the defendant from interfering with plaintiff's custody of the child until further order of the court.

The defendant, in his answer, denies that he gave his baby to his mother absolutely or for any definite length of time. He avers that he told his mother she could keep the child so long as his mother lived and cared for it in Memphis so that the child would be with its father; that he lived with his mother all the time, paying her board for himself and Kathryn; that on August 14, 1920, he married a second time, and he and wife lived with his mother until in May, 1921, paying her $100 per month for board and lodging of himself, wife, and child; that defendant then moved to another house, and permitted his mother to keep Kathryn until his wife should be well enough to receive her into their home. Defendant denies that plaintiff, with the aid of Martha Vance Farrer, has provided for, maintained, and paid for all medical treatment and advice received on behalf of the child. He avers that he and his wife have often sent clothing to Kathryn which the grandmother always returned unused: that he offered time and again to pay doctor bills whenever Kathryn was taken to a doctor or a doctor

visited her, and that he was as often told the aunts preferred to pay the bills themselves. He denies that he is or has been guilty of any neglect or delict towards his daughter. He avers that he permitted the plaintiff and Martha Vance Farrer to take Kathryn to Utah only upon the written agreement with Mrs. Farrer that Mrs. Farrer would keep the child there so long as necessary for its health, and upon the understanding that Mrs. Farrer would then deliver the girl to the defendant. The defendant denies that Kathryn had symptoms of tuberculosis, and avers that she was not well because she was growing so rapidly.

To the answer plaintiff replied. The reply in specific terms denies all new and affirmative matter set up in the answer, and alleges that, if Martha Vance Farrer signed an agreement to return Kathryn to her father, plaintiff knew nothing thereof.

Upon the evidence received the trial court made findings of fact and conclusions of law in favor of plaintiff, and entered a decree awarding the custody and care of the minor to her, subject to the right of Mrs. Nora Vance, and perpetually enjoined the defendant from interfering with plaintiff's custody of the child. Defendant appeals from that decree.

A number errors are assigned in which appellant complains that the court erred in issuing an order of injunction ex parte, and in which he assails the findings of fact, conclusions of law, and the decree as not being sustained by the evidence. It is also insisted that the court erred in overruling defendant's objection to the taking of any testimony on the alleged ground that no facts are averred which justify the depriving of defendant of the custody of his daughter, and in denying defendant's motion for nonsuit for the same reason.

It is insisted by appellant that the trial court erred in issuing ex parte a temporary injunction requiring appellant to desist and refrain from interfering with the plaintiff in

the care, custody, and control of Kathryn Vance. By this assignment a decision is sought which, if it were rendered, could not have any practical legal effect on this controversy, and it is therefore merely a moot question. Furthermore, the record discloses that this question is raised for the first time on this appeal. There was no motion made, or other proceeding had or taken, by the defendant in the court below to vacate or set aside the temporary injunction, and, having answered and proceeded with the trial on the merits, he cannot now raise the question for the first time on this appeal.

The alleged errors relating to the sufficiency of the complaint and the sufficiency of the evidence to support the findings of the trial court are founded upon appellant's contention that there is nothing alleged in the complaint nor does the evidence show any act or conduct on his part from which the conclusion may be drawn that he has lost or forfeited his primary right as a parent to have the care, custody, control, and education of his daughter. The question thus presented for determination is, Has the appellant, by anything that is alleged in the complaint or that is shown by the evidence, forfeited or lost his parental right to the care, custody, and control of his child?

We have already set out the substance of the complaint, and shall therefore now state the salient facts shown by the evidence. Kathryn Vance, the subject of this disputed custody, is the daughter of the defendant, and was born on March 17, 1917, at Monroe, La. Her mother died of tuberculosis when the child was less than a year old. She lived with her father at the home of her maternal grandmother at Monroe, La. for approximately two months. When she was but thirteen months old, April, 1918, her father brought her to his mother's home at Memphis, Tenn. At this point there is some conflict in the evidence as to the arrangement the defendant made with his mother concerning the disposition of the child. A few days before the defendant brought

his baby to his mother's home he was in Memphis, and it is shown by the evidence that with the assistance of his brother, A. O. Vance, Jr., he secured the promise of the position he now holds with the Southern Railroad. Mrs. Nora Vance, his mother, testified that at that time he said to her, "Mother, will you take little Kathryn? She will take the place of Otis, and you and Alma can have her forever if you can save her life." Otis was the baby brother, and had recently died. That such was the condition upon which the defendant committed to his mother the care and custody of the child is supported by similar statements which he made to his mother at the time he presented the child to her. Nora Vance (defendant's mother), plaintiff, Mrs. Farrer, A. O. Vance, Jr. (a brother), A. O. Vance, Sr. (father) and Mrs. Howard, all of whom were present on that occasion, testified concerning the statements and remarks made by the defendant to his mother at the time he brought the child to her, and, as told by these witnesses, the statements that the defendant made at that time were substantially of the same import and intent as the statement above quoted. There is also evidence of subsequent declarations made by the defendant soon after his marriage to his present wife to the effect that he would not take the baby from his mother and Alma, and that a stepmother should never have the child.

The defendant testified that there was nothing whatever said about giving the child away to any one; that he left the child with his mother, and there was no agreement or arrangement in reference to the baby; that there was no agreement as to what he should pay for his board or as to what he should pay for the care of the child. He testified that his salary was $200 per month, and that he paid his mother on an average of $100 per month for himself and child. He alleges, however, in his verified answer "that he told his mother that she might keep her as long as she continued to love and care for her in Memphis so that she would be near her father." Again, in reference to a subse-

quent conversation between himself and his mother, he avers in his answer that "defendant informed his mother that he had given Kathryn to her only so long as she took proper care of her and would let her visit her father."

In her deposition Mrs. Nora Vance stated, and her statement in this connection is corroborated by the testimony of A. O. Vance, Jr., and A. O. Vance, Sr., that the defendant paid her but $40 per month for his board and laundering but that before the month was ended he would borrow a part of the $40 and never did return the money so borrowed, and that nothing was paid by the defendant for the keep and support of the child.

A careful study of all of the evidence bearing upon this particular phase of the case and the situation of the parties impels us to the conclusion that the defendant voluntarily gave and surrendered the permanent custody of the baby to his mother and his sister. This was also the finding of the trial court.

The very day that the plaintiff and her mother received the baby, they had Dr. Anderson come to see the child, and his medical advice and assistance was sought. The condition of the baby, as described by Dr. Anderson, was that "she was just a poor, emaciated baby in poor condition— very thin * * * the foods she ate were disagreeing with her." Special foods and careful nursing were required to pull her through. The record shows that the grandmother was a devoted nurse, and that the plaintiff freely and gladly, with the assistance received from Mrs. Farrer, provided food, clothing, and the medical treatment prescribed on behalf of the baby. Describing the result of the treatment received by the child, the doctor said: "She got better; she got to be a nice baby, but * * * in later years she began to go down." In the meantime the defendant continued to live with his mother. On August 14, 1920, he married a second time, and brought his wife to his mother's home. Late in the fall of the same year he and his wife moved

into their own home. He left Kathryn with her grandmother. His reasons for leaving the child with her grandmother, as stated by himself in his testimony, were:

"Q. Explain why you left the baby at home instead of taking it with you to your own home? A. On account of my mother raising such a rumpus.

"Q. Well, just what did she do? A. Hollered and screamed and had fits and spasms and everything else, and wanted to beat my wife up."

In his verified answer the reason is thus given:

"Defendant permitted his mother to keep Kathryn until his wife should be well enough to receive her into their home."

Kathryn continued to live with her grandmother, making only occasional visits to her father's home. The defendant admits that she did not stay at his home "very much." On cross-examination defendant conceded that the longest period she had stayed at his home was for two or three days, and that after the first year, from the time he and his wife established their own home, her visits grew less frequent. The record clearly shows that the child had some aversion to visit at her father's home, and often begged not to be required to go.

The defendant now has two children by his present wife. There is evidence in the record that Mrs. Vance, defendant's wife, once said, when Kathryn was but a small child, that she (Mrs. Vance) had all she could attend to of her own, and that she did not want Kathryn. The record also shows that upon one occasion Mrs. Vance administered an excessive and severe whipping to the child.

The defendant testified that he permitted the child to remain with his mother for the purpose of keeping peace with her. His claim in this connection finds little or no support in the record. The only specific instance to which he refers is upon the occasion when he and his wife left his mother's home to set up their own, and that, as we have

seen, is discredited by his verified answer and denied by his mother. On both occasions, when her children were born, Mrs. Jesse B. Vance personally requested her mother-in-law to be with her during confinement, and for a period of two weeks on each occasion her mother-in-law waited on and cared for her. The defendant and his wife often came to visit with his mother. The grandmother testified that she never refused to permit the child to go to the home of its father except on one occasion. This as substantially told by her was as follows: The defendant and his wife "had the little girl in the car and I thought they were going to let her out and that they were coming back as they usually did. He just walked up the steps where I was watering the flowers and he said 'I am going to take Kathryn home' and I said 'please don't take her out there, the little skeleton; you don't have but one bed and it is too hard for the little bony child to lie on the floor." And he said, " 'Don't you say that to me' and grabbed me by the collar with his left hand and pulled me down the steps and hit me side the head." At that time Alma walked out and just clinched him, and he (defendant) said, "Let me to her, I will kill her." Alma said, "Don't you kill my mother, don't you kill her, she is our mother." Witness then said, as Mrs. A. O. Vance, Jr., went to call the police, the defendant and his wife went out into the car and drove away.

As the child grew older, she seldom, if ever, enjoyed good health. Dr. Anderson treated her all the while she was in Memphis, and upon one occasion two specialists were called in with reference to the girl's condition. The child's health did not improve, but grew worse.

The defendant testified that from the time he moved into his own home until July, 1923, he paid his mother from fifteen to twenty dollars per month for the support of the child, and from February to July, 1927, he paid her from ten to fifteen dollars per month. His sworn answer is significantly silent as to such payments, although it con-

tains allegations as to clothes he gave his mother for the child and that they were returned by her unused. He made no reference, however, in his testimony as to clothes being returned unused, but testified the clothes were thrown in the street. He minimizes and disparages the condition of the child's physical ailments in his testimony, and says "she was just as healthy as any other child only the time she was operated on for tonsils." He ridicules his mother and sister for their solicitude and anxiety over the child's condition, and belittles the efforts they rendered in behalf of the girl's health, as may be noted from the following quotation from his testimony:

Q. Now, you said to your counsel 'Mother tried to say that Kathryn was sick and ought to be out in Utah?' * * * A. I don't remember whether I did or not. I might have. * * *

"Q. Now, you told your counsel that Kathryn had never been sick until they took her to doctors, didn't you? A. Yes. Nothing to amount to anything. * * *

"Q. Now, you said that you knew they ran all over town over town to doctors, didn't you? A. Yes. * * *

"Q. And that is the way that you feel that they did? A. Yes, because they didn't know anything about children."

Yet defendant pleads in his answer that he "offered time and again to pay the doctor bills whenever they took Kathryn to a doctor or had him visit her but was as often told that the aunts preferred paying those bills themselves."

When asked by his counsel whether he had paid Dr. Anderson for the services rendered to Kathryn, he said the doctor "was coming to see my whole family and I paid the whole thing." Dr. Anderson in his deposition said that he was always paid for the services which he rendered to Kathryn by her grandmother. She, in her deposition, said that she had received the money from plaintiff and Mrs. Farrer, not only for the medical services rendered the child, but for her clothing and support generally; that she had not received any money or clothing of any kind or at any time for the child from the defendant. Her testimony in this

respect is corroborated in part by Dr. Anderson and fully by testimony of A. O. Vance, Jr., and A. O. Vance, Sr., and by plaintiff.

In July, 1923, plaintiff came to Provo, Utah, where she now resides. She brought Kathryn with her. The grandmother came about Christmas time the same year. The child grew better, and seemed to respond to treatment given to her by Dr. Wallick. On February 13, 1925, the grandmother took Kathryn back to Memphis, and she gradually relapsed into her old condition of health. Dr. Anderson again treated her, but she did not seem to respond to the treatment. By July, 1927, she had pyelitis or inflammation of the kidneys. She was in a rundown condition combined with a bad cough. The doctor had, prior thereto, advised the grandmother and the girl's teacher that the child ought to be kept entirely out of school, but, as they were anxious to have her make the grade at school, she was permitted to attend school for half days. Dr. Anderson, in his deposition, said: "She was in just as bad a condition as she could be here (Memphis) ; * * * she had a tubercular tendency: * * * the child absolutely did not do any good here, and I know that I gave it tonics and got its tonsils out, and did everything I could to build the child up, and instead of building up and being what she ought to be she went down. She had a cough all the time, and swollen glands, which the removal of the tonsils did not eliminate." The doctor then testified that for these reasons he advised the grandmother to have the child sent back to Utah.

The doctor also gave it as his opinion, assuming that the girl was fully recovered, that it was to her interest as a matter of health that she be left where she was rather than to bring her back to Memphis, "because in nine cases out of ten they go right down to where they were." From February, 1925, until July, 1927, the plaintiff continued to send to her mother monthly the money necessary for the support and maintenance of Kathryn, including medical as-

sistance rendered in her behalf. In July, 1927, the plaintiff and her sister, Mrs. Farrer, were tempoarily in Memphis with their mother and Kathryn. Plaintiff, at the request of her mother, and upon advice of Dr. Anderson, took Kathryn back with her to Provo, Utah, where the child now is and has been since that time.

In December, 1927, the plaintiff and Mrs. Farrer took Kathryn to Dr. Blood, in Salt Lake City, specialist in diseases of childhood. Dr. Blood testified that he found the patient to be a pale, emaciated girl, distinctly underweight, extremely nervous; found a throat condition which appeared to have been a partial tonsillotomy; found her to be "definitely glandular. She was a child whose chest, on examination, showed bronchial rales." On a test made by the doctor for tuberculosis showed a partial positive tuberculosis condition. A further test showed that the child had the condition known as pyelitis or pyelocystitis, "which means inflammation of the urinary tract, kidneys and lower channels leading from them." The treatment prescribed by Dr. Blood, in so far as it related to medication, was substantially the same as prescribed by Dr. Anderson in Memphis, but considerable attention was required, however, by those in charge of the girl relating to the regularity of her habits, in general eating and as to bowel conditions, and that the child be permitted outside life as much as possible. Six or seven pages of written directions were given to the plaintiff and Mrs. Farrer to follow. With what fidelity the plaintiff and Mrs. Farrer followed the directions may be ascertained by the results produced as is shown by the second examination made by the doctor. On July 2, 1928, Dr. Blood again gave the girl an examination. We quote from the doctor's testimony.

"I gave her a thorough physical examination, covering all points previously gone over. Her throat condition—no inflammation existed. Her tonsil snags were still there. The glands were smaller, the chest was clear, free from the bronchial rales. She carried no pus cells in the urine at all. Her color was greatly improved; not perfect, but

greatly improved. She has the appearance of a child who was normal or virtually so. I weighed her * * * and found that she had made a gain of thirteen pounds in seven months and four or five days."

In February, 1928 the girl was examined and treated for her eyes by Dr. Merrill of Provo. He testified that her eyesight had been adversely affected by her general physical condition, and that a toxin in her system was affecting the muscles of her eye in a serious manner. A subsequent examination showed that because of the treatment given her in reference to her eyes and the improvement in her general physical condition she was rapidly approaching a normal condition in regard to her eyesight.

The questions in dispute in this case are purely questions of fact. In cases where the right to the custody, nurture, and care of a minor child is the controlling issue, the proceedings are equitable in the highest degree. *Jones* v. *Moore*, 61 Utah 383, 213 P. 191, 194. In such a case in this jurisdiction when the question presented on appeal requires this court to examine into the evidence, the case is in effect a trial de novo on the record, and the parties are entitled to the judgment of this court as to what the ultimate judgment should be. *Jensen* v. *Earley*, 63 Utah 604, 228 P. 217; *Jensen* v. *Howell* (Utah) 282 P. 1034. In such a contest the father as the surviving parent starts with a very strong presumption in his favor. The fact that he gave the child to his mother and sister, even though it were with the present intention of committing it to their permanent custody, is not in and of itself conclusive against him. One can neither surrender the rights nor escape the obligations of parenthood so lightly. It is the settled law in this jurisdiction that a child is not the subject of an absolute and irrevocable gift. *Harrison* v. *Harker*, 44 Utah 541, page 553, 142 P. 716, 719. It does not follow, however, in the consideration of the evidence in the case, that such a gift is to be wholly disregarded. A parent, by his subsequent neglect and indifference towards his child, taken in

connection with such gift, may be held to have lost and forfeited his natural and parental rights to its custody. *Hummel* v. *Parrish*, 43 Utah 373, 134 P. 898; *Farmer* v. *Christensen*, 55 Utah 1, 183 P. 328. Furthermore, if the parties to whom the custody of a child is thus committed rely thereon and accept and assume the duties and obligations to nurture and maintain the child, and in so doing use extensively of their means and physical energies for a period of years, and all the while there were forming strong mutual attachments of the affections by reason of such associations, it may well be held that they have acquired rights with respect to its cutsody and control which are paramount to the rights of the parent. *Hummel* v. *Parrish*, supra; *Harrison* v. *Harker*, supra.

The evidence without any substantial conflict shows, and the court so found, that Kathryn has either resided with both her grandmother and the plaintiff, her aunt, or with one or the other from the time she was placed in their custody by her father in April, 1918, to the time of the trial—a period of eleven years—and by the decree of the court she is still residing with the plaintiff.

The defendant does not claim that he contributed anything towards her support during the time she has been in Provo, Utah, further than to send her a Christmas present and upon one or two occasions a birthday present. She has lived in Provo from July, 1923, to the present, with the exception of an interval from February, 1925, to July, 1927, approximately two and one-half years. During that interval of time she lived with her grandmother in Memphis. The defendant testified that he paid his mother for Kathryn's support from $15 to $20 per month from the time he established his own home to July, 1923, and from $10 to $15 per month from February, 1925, to July, 1927. His verified answer, however, contains no averment to such effect, although it contains allegations that he proffered to pay the doctor bills that plaintiff and her mother had in-

curred in Memphis in behalf of Kathryn, and that he sent her clothing which the grandmother returned to him unused. He makes no explanation to account for the disparaging difference in the amount which he says he paid his mother for Kathryn's support and maintenance subsequent to the time he established his own home as compared to the $100 per month which he testified he paid his mother for himself and child when he was living with her.

Mrs. Nora Vance, her grandmother, denies that she ever received anything whatsoever from the defendant for the nurture and support of Kathryn. She testified that she neither asked for nor expected anything from the defendant in that connection, as she knew that she and the plaintiff were charged with that obligation. Her testimony in this respect finds abundant support and corroboration in the record. The court found that the defendant had not contributed anything at all towards the support and maintenance of Kathryn for the entire period of eleven years she had been living with her grandmother and the plaintiff or with one or the other of them, except for some money sent her for presents, amounting in all to $14.

The court also found that during that entire time the plaintiff and her mother, with what assistance they received from Mrs. Farrer, nurtured, fed, clothed, schooled, and maintained Kathryn in a way suitable to her needs and conditions without any aid from the defendant, and with his knowledge thereof and his acquiescence therein. In our opinion, these findings are sustained by the vast preponderance of the evidence. From the record before us the conclusion is inescapable that the plaintiff and her mother assumed the entire obligation of nurturing and maintaining Kathryn, in the faith that the gift of Kathryn to them by the defendant was absolute both in fact and in law; and in that faith they went forward with the undertaking, willingly sacrificing their time, their physical energies, and their means to that end. Out of that association there has

been formed strong attachments between them and the child.

It is urged, however, in the defendant's behalf that, as the plaintiff had to work for her living, she had but little to do with the child. In this connection the intimate relation which existed between plaintiff and her mother must be considered. At the time the defendant brought the child to Memphis, the plaintiff was employed with the Dixie Refining Company at a good salary. She was then contributing extensively toward the upkeep of the family. She owned the equity in the house in which they were living, and, when that was lost by foreclosure, she purchased the equity in the house into which the family moved. Her father was paying for his board. Soon thereafter her father and mother separated, and, according to the deposition of her father, she "had the charge of the place and run it". She had been married and lost her husband through his accidental death. She owned an automobile, and, after her working hours, she waited on the baby, prepared it special foods, took it out riding so as to keep it in the open air as much as possible. Soon after she was transferred to New Orleans her mother with the baby went there to live with her for several months. So long as she had work she always sent money to help her mother and to provide for the baby. When she came from New York and had no employment she sold the equity in the house so as to enable them to get along. In Utah she and her mother had a joint bank account, and, after her mother went back to Memphis, the plaintiff sent her regularly a monthly allowance. Considering how close the plaintiff and her mother were to each other and the situation as it existed in the family at the time the defendant presented the child to them, and which would undoubtedly be known to him as a matter of family history, it was but reasonable that in his gift the defendant would include his sister as one of the donees. In reference to both the plaintiff and her mother we may say that it would be difficult to exaggerate the unselfish devotion in

which each of them in her own way administered to the needs of the child. All the while the defendant stood by, and, although he was earning in wages, according to his own testimony, from $200 to $250 per month, never contributed anything towards the support of his child, and never did anything to regain her custody until in August, 1928, when he made demand on the plaintiff for the custody of the child.

In this connection, however, the appellant places considerable emphasis to one item of evidence marked as Defendant's Exhibit "A". This, as the evidence shows, was written and signed by Mrs. Farrer some time in July, 1923. It reads as follows:

"This is to certify that Martha Farrer is to keep Kathryn until her father calls for her and to deliver her to no one else.

"[Signed] Martha Farrer.
"J. B. Vance."

As shown by the record, this was written by Mrs. Farrer at the dictation and direction of Mrs. Jesse B. Vance when Mrs. Farrer and her husband were on a visit to Memphis. Mrs. Farrer had made arrangements with her mother and her sister, the plaintiff, to bring Kathryn with her to Provo, Utah, at that time for the purpose of improving the condition of the child's health. She was told by Mrs. Jesse B. Vance that, if she took the child on the train, "the officers will take you off the train before you get out of the state. You will have to get permission of her father." Mrs. Farrer testified that as Kathryn was in such a "terrible condition" she wrote and signed the paper. It was not expected that the plaintiff was to come to Utah at that time. Arrangements for the plaintiff to come to Utah were subsequently made. The plaintiff nor her mother knew nothing whatever of what Mrs. Farrer had done until Mrs. Farrer told the plaintiff when they were on the train. What Mrs. Farrer did in such circumstances could not be competent and binding as against the

plaintiff or her mother. Besides, the child was later taken back to Memphis by, and lived with, her grandmother for two and one-half years under the same relations as existed from the very first. Such writing may not at this time be held to cut off the strong equities existing in favor of the plaintiff and her mother to the custody of the child. The condition of the child's health is an important factor in this case. As appears from the statement of the evidence, Kathryn's health was most generally very poor while she was living in Memphis. It was a matter of the deepest concern, and properly so, to her grandmother, the plaintiff, Mrs. Farrer, and the doctor who attended her. The defendant, however, as shown by his own testimony, was wholly ignorant or utterly indifferent as to the serious condition of the girl's health. Taking into consideration the extent of her ailments and the duration of time in which she suffered, and the fact that the defendant did nothing at all to improve her condition in respect to her health, warrants the conclusion that the defendant, during all the time the child lived in Memphis, either had no intention or desire of ever regaining the custody of Kathryn, and was content to let her remain permanently in the care and control of his mother and sister, or that he was guilty of a grave dereliction of duty towards his child in reference to her health.

We therefore have a situation before us in this case where the defendant as the surviving parent voluntarily surrendered the custody of his child to his mother and sister in consummation of what is, in form at least, an absolute gift to them of the child; and through twelve intervening years he has done nothing at all to nurture, clothe, feed, and maintain the subject of his gift, although he was able to do so, and stood by while those into whose custody he had thus placed the child assumed the obligations and expanded freely of their means, their time and energy to keep, maintain, and educate the child. Under these circumstances we are of the opinion, and so hold, that the defendant has lost and forfeited the natural and

presumptive right of a parent to the care, custody, and control of his child.

This case is controlled by the doctrine adopted in the case of *Hummel* v. *Parrish,* supra, and approved in the case of *Harrison* v. *Harker,* supra, wherein the court said:

"The decisions rendered in this class of cases almost universally hold that where, as here, a parent has surrendered the control of his child when it was a toddling infant to other parties, and permitted them to maintain, clothe, feed, and care for it until it is eight or nine years of age, and a strong reciprocal mutual affection has grown up between the child and its foster parents, as in the case at bar, and the parent seeks to recover possession of the child, the natural or presumptive right of the parent cannot prevail, if the interests and welfare of the child forbid it. The law in such cases regards the welfare and permanent interests of the child much more important than the natural or presumptive right of the parent. In other words, the paramount consideration in such cases is the well-being of the child."

So, in the instant case, the defendant having by his gift or agreement and his subsequent conduct lost and forfeited the legal and preferential rights as the parent to the custody of his child, but now desires to reclaim its ■ control and custody, the best interests of the child become the controlling and determining principle in the case. *Jones* v. *Moore,* supra. In this case the court, in speaking in reference to the best interests of the child said:

"No hard and fast rule with respect to what may be considered the best interests of a child can, however, be laid down to govern in all cases. Each case must be determined upon its own peculiar facts and circumstances."

There is no doubt but what the child, whose custody is in dispute, has been, and now is being well and kindly treated under the care, custody, and control of the plaintiff, and that she is happy and contented where she now is. There can be no question that the girl's physical ■ condition and the state of her health has been greatly

improved and that her moral and educational training has been and is all that could be desired. There is one counter weight which, perhaps, operates against the plaintiff. It is stressed with considerable earnestness by counsel for the defendant. That is that the plaintiff's time is devoted to her business as the manager of a retail store, and during the working hours from 9 a. m. to 6 p. m. on six days of the week, with the exception of the lunch hour, it is impossible for her to be at home. We appreciate that ordinarily this is a circumstance of considerable importance. In this case what would or might be the ill effect of such a situation is overcome by arrangements the plaintiff has with Mrs. Joseph Farrer, a sister of the plaintiff and also of the defendant. Mrs. Farrer is devoted to her niece, and, as shown by the record, has contributed towards her support and for her medical assistance from the first. Mrs. Farrer has a home one block from where the plaintiff resides, and after school hours and on Saturdays the girl goes to the Farrer home. Both the plaintiff and Mrs. Farrer are able, efficient, and refined women, suitable and qualified in every way to have the care, control, and education of a girl such as Kathryn. There is a strong mutual attachment between Kathryn and her aunts. From the record before us the home life of the girl has been and is all that could be desired; and, as it now appears, we have no reason to believe that this favorable condition will not continue in the future. If for any reason it should not, there is no bar for a subsequent appplication under changed conditions. *Ex parte Gille,* 65 Cal. App. 617, 224 P. 784; *Miller* v. *Gordon,* Ann. Cas. 1916D, 511. Kathryn is now well past thirteen years of age, and in less than five more years will have reached her majority. She appears to be, to say the least, of ordinary intelligence, with sufficient mental development to make a reasonable choice. At the trial of the case she expressed a decided preference to remain where she is. In resolving the question as to what will best subserve the interest and happiness of a minor child, its own choice may be consulted and given

weight if it be of an age and capacity to form a rational judgment. The decisions do not fix any definite age when such a choice may be made. It depends upon the extent of the child's mental development. *Richards* v. *Collins*, 45 N. J. Eq. 283, 17 A. 831, 14 Am. St. Rep. 726; *Marshall* v. *Reams*, 32 Fla. 499, 14 So. 95, 96, 37 Am. St. Rep. 118, where the court said:

"The wishes, however, of children of sufficient capacity to choose for themselves should be given especial consideration when their parents have for a long time voluntarily allowed them to live in the family of another; and the court will make no coercive order in such cases, to enforce the mere legal right of the parent to their custody, against the manifest inclination and reasonable choice of the children to remain where they are."

Consideration of the child's health, in view of the fact she did not do well at Memphis, and, according to Dr. Anderson's opinion, the strong likelihood of her relapsing to her old condition, renders it almost imperative that she should be permitted to remain with the plaintiff. There is nothing in the record to indicate that the defendant would be any more thoughtful or considerate of the condition of her health in the future than he has been in the past.

That Mrs. Jesse B. Vance did not want Kathryn when she was a small child finds ample support in the evidence. We have already stated that the child has some aversion to staying at her father's home. If Mrs. Jesse B. Vance could not win the confidence and love of the child, what may be expected of her in that connection were the girl now past thirteen years of age to come into her home. The defendant does not mention a single item wherein he claims that Kathryn's welfare and interest would be promoted should the court award her to his custody.

We are therefore of the opinion that the girl's welfare and interests will be best subserved by permitting her to remain with the plaintiff.

Complaint is made that there was a fatal defect and non-joinder of parties plaintiff because it is alleged in the com-

plaint that the child was given to Mrs. Nora Vance and to the plaintiff. The question was raised in the trial court by an objection to the taking of any testimony in the case. This objection cannot be sustained. It appears from the complaint and from the deposition of Mrs. Nora Vance herself that the child is now with the plaintiff and in the plaintiff's custody by the consent and in accordance to the direction and wish of Mrs. Nora Vance, who claims no adverse right to the custody of the child as against the plaintiff. The complaint was sufficient to admit the evidence, and the evidence supports the finding of fact and decree.

Judgment affirmed.

CHERRY, C. J., and STRAUP, ELIAS HANSEN, and FOLLAND, JJ., concur.